IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **ANDY E. TUCKER,** | ) |
| Plaintiff, | ) |
| V. | ) Civil No. **04-916-JLF** |
| **JO ANNE B. BARNHART,** | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION**

**PROUD, Magistrate Judge:**

Plaintiff Andy E. Tucker is before the Court seeking review of the final decision of the Social Security Administration terminating his Supplemental Security Income (SSI) benefits pursuant to 20 C.F.R. § 416.994.[1] **(Doc. 1).** Both plaintiff and the defendant agency commissioner have fully briefed their positions **(Docs. 19 and 30)**, and the administrative record has been produced **(Doc. 8, hereinafter "R.")**.

Pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C), this Court makes the following Report and Recommendation.

**Synopsis of Relevant Procedural History and Evidence**

Plaintiff Andy E. Tucker's birth in 1972 was premature, and he had either a collapsed lung or pneumonia. **(R. 134 and 140).** Plaintiff has a history of respiratory problems, and a

---

[1]The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. Pt. 416.  20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the Disability Insurance Benefits regulations.

history of ear infections which have required the insertion of tubes multiple times, and which has caused some hearing loss. **(R. 134 and 140).** At the age of six, plaintiff was three years behind in growth. **(R. 134 and 140).** Plaintiff was deemed disabled as of October 29, 1985, when he was 13 years old. More specifically, in 1985 plaintiff was found to meet Listing 103.13A (20 C.F.R., Pt. 404, Subpt. P, App. 1 Pt. B § 103.13A) (West 1985)), which pertains to the presumptively disabling pulmonary manifestations of cystic fibrosis.[2]

The present record contains only the November 1985 report of Dr. Robert Parks, M.D., which offers a relatively thorough review of plaintiff's physical condition, including pulmonary function studies. **(R. 129-133).** Dr. Parks' diagnostic impression was that plaintiff had a bronchial obstruction, and probably "some type of learning difficulty along also with developmental problems. **(R. 132).** At that time, plaintiff's FEV1 was .9 liters pre- and post-bronchodilator, which was sufficient to satisfy Listing 103.13A. **(R. 132).** In addition, at that time plaintiff's Forced Vital Capacity (FVC) was 1.4 liters pre-bronchodilator, and 1.5 liters post-bronchodilator. **(R. 132).** Plaintiff stood 55.75 inches tall in November 1985, and he was enrolled in special education classes, which he continued until he quit school in the 11th grade. **(R. 27 and 130).**

In January 2001 the Agency notified plaintiff that, based on Dr. Raymond Leung's recent evaluation, he was no longer considered disabled and benefits would cease in February 2001. **(R. 55).** At that time plaintiff was 28 years old, and he stood 63 inches tall, which was characterized as "mostly normal." **(R. 134 and 137).** In December 2000 Dr. Leung observed

---

[2]The claimant must have a Forced Expiratory Volume (FEV) equal to less than those specified in Listing 103.00A.

2

that plaintiff had and occasional cough, wheezing, shortness of breath most of the time, slightly decreased breath sounds bilaterally, and a mild breathing obstruction. **(R. 137).** Pulmonary testing confirmed mild obstruction. **(R. 138).** Scarring over the right tympanic membrane was observed, but Dr. Leung found plaintiff could hear and follow commands with his eyes closed, although he had decreased ability to hear fingers rubbed in front of his right ear. **(R. 136-137).** Plaintiff was deemed capable of bending, squatting, prolonged sitting and standing without difficulty and, by his own account, could walk and climb four to five flights of stairs. **(R. 135).** Dr. Leung reported that plaintiff was not taking any medications, and he had not been hospitalized for breathing difficulty in the past 10 years. **(R. 134-135).**

In January 2001 Dr. Anad Salem concluded plaintiff had borderline respiratory obstruction and emphysema. **(R. 140-143).** A chest x-ray was read to show right middle lobe pneumonia, but Dr. Salem did not believe plaintiff had chronic pneumonia. **(R. 144-145).** Dr. Salem also noted that test confirmed conduction hearing loss in the right ear. **(R. 141).** A month later, in February 2001, Dr. Parviz Sanjabi examined plaintiff and reviewed a chest CT and x-ray, which he found consistent with bronchiectasis and emphysema, and compatible with COPD, although plaintiff is not himself a smoker[3]. **(R. 148-149).** At that time plaintiff asserted he was not able to walk more than 100 feet without shortness of breath, and he was incapable of carrying any loads or performing any manual work. **(R. 148).** Plaintiff's FEV1 pre-med was 3.28 liters and 2.5 liters post-med, and his FVC was 3.86 liters pre-med and 4.37 liters post-med. **(R. 150).** A CT scan of plaintiff's sinuses showed complete opacification of the maxillary and

---

[3]Plaintiff has declared himself a nonsmoker **(R. 149)**, but there are notations in the medical records indicating he was a smoker, or a former smoker **(R. 282)**. In any event, plaintiff is at least a passive smoker, in that his wife smokes. **(R. 185).**

3

sphenoid sinus and significant mucosal thickening of the ethmoid sinus with septal deviation, and mild mucosal thickening of the right frontal sinus. **(R. 152).** Dr. M. Hal Pearlman characterized plaintiff as having chronic sinusitis. **(R. 156).** Dr. Pearlman also diagnosed plaintiff with right serous otitis media, and a tube was subsequently inserted in plaintiff's right ear in April 2001. **(R. 153 and 156).** In July 2001 plaintiff indicated his hearing was still good and he was not desirous of more tubes at that time, although a tube was inserted in the left ear in November 2001. **(R. 174 and 176).**

In May 2001 Dr. Sanjabi's respiratory report indicated an x-ray supported the diagnosis of COPD, with a significant asthmatic component. **(R. 158).** Plaintiff was considered to have a reduced exercise tolerance, and to be significantly limited for lifting, walking or carrying. **(R. 158-159).** Plaintiff was using three bronchodilators at that time with equivocal results. **(R. 159).**

Dr. Leung evaluated plaintiff in July 2002, again finding plaintiff capable of bending, squatting, prolonged sitting and standing without difficulty. **(R. 256).** Plaintiff indicated he could walk 100 yards before needing to stop due to shortness of breath, and he was capable of climbing a flight of stairs at a time. **(R. 256).** Testing at that time showed borderline respiratory obstruction. **(R. 259).** Chest x-rays were negative for any current problems. **(R. 263).**

In February 2004 Dr. Sanjabi noted COPD, ear infections, and the fact that plaintiff was not taking his prescribed medications. **(R. 284).** Pulmonary function tests performed in April 2004 showed plaintiff had moderate obstruction, and an FEV1 of 3.19 liters pre-med and 2.27 liters post-med. **(R. 276-277).** One month later, in May 2004, plaintiff presented himself to Dr. Salem with a cough, cold, congestion, wheezing and ear drainage. **(R. 279).** Dr. Salem merely continued plaintiff on his two asthma medications, Advair and Combivent. **(R. 279-280).** A CT

scan again showed bilateral bronchiectasis, with no significant change. **(R. 281).** Dr. Salem then offered an additional diagnosis of episodic dyspnea. **(R. 282).** The final medical evaluations in the record were performed by Dr. Istanbouly, who diagnosed plaintiff with COPD, bronchiectasis and allergic rhinitis. **(R. 285).** Dr. Istanbouly added Flonase nasal spay and Claritin to plaintiff's medications, and a bronchoscopy with bronchial washing and bronchoalveolar lavage was performed. **(R. 287).**

With respect to the mental aspect of plaintiff's claimed disability, in July 2001 psychologist Dr. Harry Deppee evaluated plaintiff, who by this time was 30 years old. **(R. 264).** Dr. Deppee observed that plaintiff's expressive and receptive skills appeared within normal limits. **(R. 264).** Plaintiff told Deppee that he hunted and fished, although he also described having trouble breathing. **(R. 265).** Tests revealed plaintiff had a full scale IQ of 77, verbal IQ of 77, performance IQ of 81, a Global Assessment of Functioning (GAF) score of 65, and "borderline intellectual functioning." **(R. 266-267).** Dr. Deppee opined that plaintiff was likely to experience little difficulty performing job duties which are mildly complicated in nature. **(R. 266).** There was no remarkable impact on work-related activity and only mild effect on interests and habits, and mild restrictions on daily activities. **(R. 266).**

In August 2002 another psychological evaluation was performed by Dr. Carl Hermameyer. The form Dr. Hermameyer completed indicates plaintiff had a verbal, performance or full scale IQ of 59 or less. **(R. 242).** Hermameyer also indicated plaintiff had mild restrictions on activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence or pace, and no episodes of decompensation– none of which reached the noted threshold for meeting Listing

12.05. **(R. 248).** A functional capacity assessment completed by Dr. Hermameyer at the same time indicates plaintiff had a borderline IQ with the mental capacity to perform simple tasks. **(R. 254).** Plaintiff was also found to be moderately limited in his ability to understand, remember and carry out detailed instructions. **(R. 252).**

In May 2004 plaintiff testified that he was 32 years old, had completed the 11th grade in special education classes; he can read and write "some," add and subtract "some," but not sufficient to make change, and he can follow directions. **(R. 27-28 and 47).** Plaintiff has a driver's license. **(R. 28-29).** Plaintiff has never held a job. **(R. 29).** Plaintiff opined that he would have trouble working due to his breathing difficulties, and he did not think his legs and back would "hold up." **(R. 46).**

According to plaintiff, he uses his inhalers multiple times daily, and he can breathe pretty well sometimes. **(R. 30-31).** Plaintiff offered that his breathing may have improved over the past three or four years. **(R. 45).** However, he has trouble breathing in certain situations, including when he bends over, when it is hot and humid or cold, if he walks farther than a block, or when climbing stairs. **(R. 31-32, 34-35 and 45).** Plaintiff estimated that he is unable to function one day per month. **(R. 43).** With respect to his ears, he acknowledge the tubes and trouble with infections and drainage, and plaintiff reported having trouble hearing "sometimes." **(R. 36-37 and 46).** Plaintiff indicated he had no difficulty sitting or standing, and he described helping with household chores, such as simple cooking and doing the dishes. **(R. 32).** Plaintiff thought he could carry two gallons of milk, which would weigh approximately 20 pounds. **(R. 34).**

Administrative Law Judge (ALJ) Marsha Stroup questioned vocational expert Dr. Darrell Taylor about the ability of a hypothetical person's ability to work. The hypothetical person supposedly mirrored plaintiff, and was functionally illiterate, with a need to avoid climbing, with a mild hearing problem, and with sensitivity to smoke, fumes, pollutants and extremes in temperature. **(R. 48).** According to Dr. Taylor, there were unskilled jobs in the area economy which such a person could perform: 8,000 sedentary assembler jobs; and 1,800 sedentary production inspector/checker jobs. **(R. 48).** Those jobs could be learned with simple demonstration. **(R. 49).** Dr. Taylor thought those positions would allow a small amount of absenteeism– up to two days in a month– but, such repeated absenteeism in a two or three month period would probably prevent employment. **(R. 49).**

ALJ Stroup found that plaintiff had three severe ailments: (1) lung disease; (2) mild hearing loss with recurrent ear infections; and (3) a borderline IQ. **(R. 19).** Any growth impairment as a child was not considered a severe impairment in adulthood, or impediment to work. **(R. 16).** The ALJ ultimately concluded that, using current Adult Listings for respiratory ailments[4], plaintiff exhibits medical improvement since he was deemed disabled at age 13, such that he could now perform sedentary, unskilled work with restrictions. **(R. 12-20).**

ALJ Stroup did not find plaintiff's testimony fully credible; she relied upon the evaluation offered by Dr. Deppee relative to the mental component, and for the physical component she

---

[4] 20 C.F.R., Pt. 404, Subpt. P, App. 1 Pt. A, §§ 3.03 (asthma), 3.04 (cystic fibrosis), 3.07 (bronchiectasis), and 3.08 (chronic, persistent infections of the lung).

relied primarily on the evaluations of Dr. Leung and "Dr. John Romano"[5], although the evaluations by Drs. Salem, Sanjabi and Pearlman were also cited.  **(R. 13-15 and 18).**  The ALJ specifically noted that Dr. Hermameyer had indicated plaintiff had only mild restrictions and moderate difficulties, but had then had checked a box indicating plaintiff's IQ was 59 or less, qualifying him as mentally retarded under Listing 12.05.  **(R. 16).**  ALJ Stroup stated: "Oddly, the examiner marked a box on the Psychiatric Review Technique form indicating that the claimant had a valid verbal, performance, or full scale IQ of 59 or less.  Dr. Deppe's [sic] test results, reported above, make it clear that the claimant's IQ scores were in fact higher than this."  **(R. 16).**  In any event, from the ALJ's perspective, Listing 12.05 was not satisfied.  **(R. 16).**

Based upon Medical Vocational Rule 201.24 and Dr. Taylor's vocational testimony, plaintiff was found not disabled.  **(R. 20).**  Plaintiff was found capable of performing specified work found in the regional economy, even taking into consideration plaintiff's lack of acute hearing, and necessary restrictions prohibiting work involving climbing, or involving extreme temperatures or smoke, fumes or other pollutants.  **(R. 19-20).**

## Applicable Standards

As a general matter, the Court reviews the decision denying plaintiff benefits to ensure that the ALJ's decision is supported by substantial evidence, and that no mistakes of law were made.  ***See* 42 U.S.C. § 405(g).**  In reviewing for "substantial evidence" the entire administrative

---

[5]According to the ALJ, "Dr. Romano" opined that plaintiff had chronic COPD without a significant asthmatic component, with positive response to medication, but significantly limited as to lifting, carrying and walking.  **(R. 14).**  The ALJ specifically relied upon Romano in determining plaintiff's residual functional capacity. **(R. 18).**  The referenced February 2001 assessment is not in the present record. This Court perceives that John Romano is an Agency Disability Officer.  Romano's June 2001 disability decision is in the record, although it was rendered moot as a result of an intermediate remand in April 2002.  **(R. 75-85; 183-184).**

record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  **Brewer v. Chater**, 103 F.3d 1384, 1390 (7th Cir. 1997).  Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence.  **Sample v. Shalala, 999 F.2d 1138, 1143 (7th Cir. 1993).**

To qualify for SSI, a claimant must be "disabled."  "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. § 1382c(a)(3)(A).**  A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  **42 U.S.C. § 1382c(a)(3)(C).**

In deciding whether a disability continues, it must be determined if there has been any medical improvement in the impairment(s) and, if so, whether the medical improvement is related to the claimant's ability to work.; *and* the claimant must currently be able to engage in substantial gainful activity.  **20 CFR 416.994(b).**  If there has been medical improvement, but it is not related to the claimant's ability to do work and none of the specified exceptions apply, the claimant's benefits will be continued.  **20 CFR 416.994(b)(1)(ii).**

> Medical improvement is any decrease in the medical severity of your impairment(s) which was *present at the time of the most recent favorable medical decision* that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) (see § 416.928).

**20 CFR 416.994(b)(1)(i) (emphasis added).**

The prescribed analytical steps are:

1. Does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of subpart P of part 404 of this chapter? If you do, your disability will be found to continue.

2. Has there been medical improvement?

3. If there has been medical improvement, is it related to the claimant's ability to do work; i.e., whether or not there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination?

4. If there has been no medical improvement or the medical improvement is not related to the claimant's ability to work, certain exceptions are considered, none of which are arguable applicable in this case.

5. If medical improvement is shown to be related to your ability to do work, it must be determined whether current impairments are severe (*see* § 416.921). This determination will consider all current impairments and the impact of the combination of these impairments on the claimant's ability to function.

6. If the claimant's impairment(s) is severe, his or her current ability to do substantial gainful activity in accordance with § 416.960 must be assessed; i.e, residual functional capacity and whether the claimant can perform any past work will be assessed.

7. If the claimant is unable to do past work, the question becomes whether, given the claimant's residual functional capacity assessment, age, education, and past work experience, can he or she do other work? If the claimant can, disability will be found to have ended. If the claimant cannot, disability will be found to continue.

**20 CFR 416.994(b)(5).**

## Issues Presented

Plaintiff does not specifically assert that there is insufficient evidence to support the ALJ's conclusions. Rather, plaintiff contends the ALJ did not fully develop the record in that documents from the period between 1985 and 2001 are missing:

1. Records from Barnes Hospital dated April 18, 1983;

    2.  An assessment by Dr. Widicus dated December 4, 1985;

    3.  School records; and

    4.  Documentation of the IQ test(s) Dr. Hermameyer relied upon.

Plaintiff argues that the ALJ erred in not fully exploring the basis for Dr. Hermameyer's IQ findings, and by not obtaining school records, which would likely contain an Individual Education Program and assorted test results.

### Analysis

The absence of the record relating to the initial disability determination in 1985 is not as problematic as it may appear. When the prior file cannot be located, rather than try to reconstruct prior evidence, the determination of whether the claimant can *now* engage in substantial gainful activity is determined first. **20 F.F.R. § 416.994(b)(2)(iv)(E).** If the claimant is found capable of sustained gainful activity, then it must be determined whether an attempt to reconstruct the *relevant portions* of the record is warranted, based on the age of the records, likely availability and whether a complete record of the basis for decision will be able to be obtained. *Id.* **(Emphasis added)**. If relevant parts of the prior record are not reconstructed, or are not able to be found, medical improvement cannot be found. *Id.* The documentation of the claimant's current impairments will form the basis for any future reviews. *Id.* If the missing file is later found, it may serve as the basis for reopening any decision. *Id.*

In this situation, the original determination of disability was premised solely upon pulmonary function– Listing 103.13A. The references to the Barnes Hospital records dated April 18, 1983, and agency physician Dr. Widicus's December 4, 1985, assessment both clearly indicate that those documents are consistent with the determination that plaintiff met Listing

103.13A.  **(R. 77).**  Since plaintiff was not deemed disabled prior to October 29, 1985, the Barnes Hospital records from 1983 simply are not relevant.  Dr. Widicus's December 4, 1985, assessment was essentially issued  contemporaneous with Dr. Parks' November 27, 1985, assessment.  However, it must be noted that consulting physician Dr. Parks' assessment– which is in the present record-- contains objective test results and provides the required point of comparison.  **(R. 129-133).**  Plaintiff has not suggested the relevance of Dr. Widicus's evaluation.

In *Flener ex rel. Flener v. Barnhardt*, 361 F.3d 442, 448 (7th Cir. 2004), the Court of Appeals for the Seventh Circuit recognized "it is always possible to identify one more test or examination an ALJ might have sought, the ALJ's reasoned judgment of how much evidence to gather should generally be respected."  This Court contends that the same principle should apply to this situation, particularly since Section 416.994(b)(2)(iv)(E) only requires the *relevant* portions of the record be obtained.

Plaintiff was deemed disabled when he was 13 years old due to his breathing ailments, *not* because of mental issues, so his school records are not relevant in terms of time or subject matter.  There is no dispute that plaintiff was in special education classes, but for purposes of his new claim of disability due to mental retardation, his abilities at age 32 are relevant, not how he performed many years before.  Plaintiff's mental status relates to his present ability to perform work; no point of comparison is needed.

Documentation of IQ testing underlying Dr. Hermameyer's evaluation indicating plaintiff had an IQ of 59 or less appears relevant at first blush, but not in light of the test results supporting Dr. Deppee's evaluation, and the lack of other evidence even remotely suggesting

that plaintiff's IQ was at a level of 59 or below, where he would be presumptively disabled.

Listing 12.05 pertaining to mental retardation requires: (1) a verbal, performance or full scale IQ of 59 or less; or (2.) a verbal, performance or full scale IQ of 60-70 and a physical or other mental impairment imposing an additional and significant work-related limitation on functioning; or (3) a verbal, performance or full scale IQ of 60-70, resulting in multiple specified restrictions or difficulties, or repeated episodes of decompensation.  On the GAF 0-100 scale, a rating between 11 and 50 indicates intermediate functioning with serious impairment (the higher the score, the less the impairment).  **Psychiatric and Psychological Evidence § 2.04, 2-5 (Daniel W. Shuman, ed., 2nd ed. 1998).**  A GAF score of 50 denotes "Serious symptoms" or "any serious impairment in social, occupational or school functioning." ***See*, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), p. 32.**   DSM-IV labels the GAF range of 50-60 as "moderate" symptoms in social or school functioning. The use of the term moderate by DSM-IV denotes only the range between mild and severe: the text describes the range as involving "serious impairment in social, occupational or school functioning." *Id.*  The range between 60 and 70 denotes some mild symptoms or some difficulty in social, occupational or school functioning.  *Id.*

With the exception of checking the "IQ of 59 or less" box, Dr. Hermameyer consistently indicated that plaintiff had no worse than mild restrictions and moderate difficulties, which would be inconsistent with an IQ of 59 or less and a GAF of 65.  In contrast, the restrictions and difficulties observed by Dr. Hermameyer are consistent with his characterization of plaintiff as having a "borderline" IQ and the mental capacity to perform simple tasks.  Furthermore, none of the other physicians noted that plaintiff's mental acuity was consistent with an IQ of 59 or less.

The mere absence of supporting test results for what is so obviously just a mis-checked box is insufficient to negate all of the contrary evidence in the record.  Moreover, assuming there are valid test results showing plaintiff has an IQ of 59 or less, plaintiff does not then explain how Dr. Hermameyer's other activities of daily living and functional observations would be explained away, since they would then be inconsistent with the test results and all of the other evidence in the record, including plaintiff's own testimony.

For the aforementioned reasons, the issues presented by plaintiff all fail.  Since plaintiff has not otherwise attacked the sufficiency of the evidence supporting the ALJ's conclusions, this Court will only offer a cursory review of the analytic steps outlined in Section 416.994(b)(1).

Using Dr. Parks' 1985 evaluation as the point of comparison, plaintiff has exhibited improvement to the point that he cannot satisfy the adult Listings, 20 C.F.R., Pt. 404, Subpt. P, App. 1 Pt. A, §§ 3.03 (asthma), 3.04 (cystic fibrosis), 3.07 (bronchiectasis), and 3.08 (chronic, persistent infections of the lung).  Plaintiff's recent FEV1 results were well above the 1.65 liters required to satisfy Listing 3.04, the adult standard equivalent to children's Listing 103.13A, which set the bar at .95 liters, or lower.  (***Compare*** **R. 150 and 276-277** *with* **R. 132).**

Plaintiff has not specifically attacked the residual functional capacity assessment, but this Court notes that it is actually on the "forgiving" side, limiting plaintiff to sedentary work, when there is evidence plaintiff has no difficulty standing, and  he still retains the ability to walk a block, and there is no objective evidence or recorded complaints of musculoskeletal problems, only shortness of breath upon excess exertion.  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of

walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." **20 C.F.R. § 416.967(a).**  There is no evidence suggesting plaintiff cannot meet that standard.

Plaintiff satisfies Medical Vocational Rule 201.24, which classifies claimants who are younger (22-44 years old), illiterate, and unskilled or with no previous work experience. Vocational expert Dr. Taylor confirmed that plaintiff's hearing difficulty, and the additional restrictions about avoiding climbing, with and environmental irritants like smoke, fumes, pollutants and extremes in temperature, would still permit plaintiff to perform thousands of jobs. Concerns about absenteeism appear unfounded, given that plaintiff had not been hospitalized in the past ten years, and he only guessed that he would be absent one day each month, although the medical records did not really support such an assertion.

## Recommendation

For the aforestated reasons, it is the recommendation of this Court that the decision of ALJ Stroup terminating plaintiff Andy E. Tucker's Disability Insurance Benefits should be affirmed in all respects, and judgment should enter accordingly.

**Submitted: January 30, 2006**

s/ Clifford J. Proud
**CLIFFORD J. PROUD
U. S. MAGISTRATE JUDGE**

## Notice of Response Deadline

In accordance with 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 6(e), the parties shall file any objections to this report and recommendation on or before **February 16, 2006**.